# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

TRACY D. WRIGHT                                                                  PLAINTIFF

V.                         CASE NO. 5:19-CV-05016

BELLA VISTA POLICE DEPARTMENT;
OFFICER JEREMIAH MORRIS; and
OFFICER ANTHONY KING                                        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

In this civil rights action filed pursuant to 42 U.S.C. § 1983, Plaintiff Tracy D. Wright[1] contends his constitutional rights were violated during an encounter with two officers of the Bella Vista Police Department on November 10, 2018. Specifically, Wright maintains that he was unlawfully detained while on the way to the restroom; he was subjected to cruel and unusual punishment when he was made to wait to use the restroom; and his privacy was invaded when he was required to urinate and defecate in full view of the Defendant officers. The Defendants are the Bella Vista Police Department and Officers Jeremiah Morris and Anthony King. Although the Bella Vista Police Department is a named Defendant, a police department is not usually considered a legal entity subject to suit under 1983. *See, e.g., Ketchum v. City of W. Memphis*, 974 F.2d 81, 82 (8th Cir. 1992). Defendants have been sued in both their individual and official capacities.

---

[1] Wright is proceeding *pro se*. In his summary judgment response, Wright has requested appointment of counsel. (Doc. 38 at 9). However, his summary judgment response is articulate, well-reasoned, and supported by legal research. Accordingly, the Court concludes that Wright is adequately representing himself, and his request for appointment of counsel is **DENIED**.

1

The case is before the Court on Defendants' Motion for Summary Judgment (Doc. 26). Wright responded (Docs. 38, 41, 42, 47), and Defendants filed a reply (Doc. 39). The Motion is ready for decision.

## I. BACKGROUND

According to Officer Morris's incident report, his interaction with Wright occurred as follows. On Saturday, November 10, 2018, at approximately 12:00 am, Officer Morris, who was traveling southbound on U.S. Highway 71 in Bella Vista, Arkansas, observed a silver Chrysler Town and Country travelling northbound with its emergency lights flashing. The car was going 25 miles per hour in a 45 mile-per-hour zone. (Doc. 26-1 at 2). Officer Morris initiated a traffic stop after he observed the vehicle weaving and abruptly changing lanes. *Id.* The vehicle did not immediately stop. *Id.* The vehicle was being driven by Alexandria McNeil, and Wright was seated in the back of the vehicle. *Id.* at 3.

McNeil and Wright explained to Officer Morris that they were driving slowly because the transmission on the car had gone out and only first gear was operable. *Id.* McNeil stated that she did not stop immediately because she could not get the vehicle into park. *Id.* Both McNeil and Wright had suspended driver's licenses and were active probationers with search waivers on file. *Id.* Officer Morris searched the vehicle but found nothing illegal except a mostly empty bottle of vodka. *Id.* He noticed that the odor of intoxicants was present, and he conducted pat-down searches of both McNeil and Wright.

McNeil was arrested for driving on a suspended driver's license. (Doc. 26-1 at 3). She was transported to the Bella Vista Police Department, cited for driving on a

suspended license, and then released.  *Id.*  The vehicle was towed because Wright's driver's license was also suspended, and the vehicle was deemed unsafe.  *Id.*  Wright retrieved his belongings and was taken by Officer King to a nearby Casey's General Store ("Casey's").  Officer Morris drove McNeil to join Wright at Casey's after McNeil was released.  *Id.*

At 2:45 a.m., Officer Morris was advised by dispatch that Wright had a possible failure- to-appear warrant out of Springdale.  (Doc. 26-1 at 4).  Officers Morris and King traveled to Casey's to look for Wright.  *Id.*  Officer Morris reported that as they pulled up to the store, Wright was watching them from the window.  Wright stood up, put his hands in his coat pockets, and started walking towards the restroom.  *Id.*  In his affidavit, Officer Morris states that Wright was not wearing his coat during the traffic stop.  (Doc. 26-9 at 1).  Officer Morris claims that he entered Casey's and repeatedly instructed Wright to stop and take his hands out of his pockets.  Because of Wright's "suspicious demeanor," Officer Morris worried that Wright "was hiding something illegal on his person and planned to get rid of it in the bathroom."  *Id.*  Wright told the officers that he needed to urinate.  (Doc. 26-1 at 4).  Officer Morris took hold of one of Wright's arms, told him that he was being detained due to a possible warrant, and placed him in handcuffs.  *Id.*

Wright continued to complain that he had to urinate.  Officer Morris was worried Wright may have been putting drugs or weapons in his pockets and attempting to destroy the evidence in the restroom.  *Id.*  Wright allowed his pockets to be searched, and after that, Officer Morris allowed Wright to go to the restroom, but not alone.  Both officers went with him.  *Id.*

3

The Court has been provided with Officer Morris's dashcam video. (Doc. 26-3). While the video only shows the front of the store (from the perspective of the dashboard on Officer Morris's cruiser), the audio comes from a microphone attached to Officer Morris's person.

The restroom where Wright and the two officers entered was a multi-person, public restroom with two or three urinals and two or three stalls. (Doc. 26-6 at 6). Officer Morris took the handcuffs off Wright and told him to use the urinal. (Doc. 26-1 at 4). Wright indicated that he also had to defecate and would need to sit down. *Id.* Officer Morris wrote in his incident report that he held the stall door open "to verify [Wright] didn't take anything illegal out of his pants or body." *Id.* In the audio from Officer Morris's dashcam, Officer Morris can be heard telling Wright that he could "shut the door" to the stall but "not flush the toilet" because Officer Morris did not want Wright to be "flushing some drugs." (Doc. 26-3, at timestamp 2:43–2:53)

In Officer Morris's opinion, Wright sat on the toilet an unreasonable amount of time. When he told Wright to get out of the stall, Wright argued and stated he had hemorrhoids. (Doc. 26-1 at 4). Wright demonstrated this by wiping and showing Officer Morris the toilet paper with blood on it. *Id.* Wright at some point started rubbing "vigorously on his right leg inside his pants." *Id.* According to Officer Morris, when he asked what Wright was doing, Wright responded that he had a leg cramp and was trying to rub it out. *Id.* When Wright stood up, Officer Morris looked in the toilet and observed "no urine or feces" and only toilet paper and a napkin from the restaurant section of the store. *Id.* Officer Morris claims that he told Wright that he did not want to be in the restroom with him any

4

more than Wright wanted him there. (Doc. 26-9 at 2).

While Wright was in the restroom, Springdale Police Department confirmed that Wright was, indeed, wanted on a warrant for failure to appear. Wright was placed under arrest *in the restroom* (Doc. 26-3, timestamp 7:42), taken to Officer King's patrol car, searched, and then transported to the Pleasant Grove Wal-Mart to meet with the Springdale Police Department. Wright was released into their custody.[2]

According to Officer King's affidavit, when he arrived at Casey's, he observed Wright sitting at a table near the front of the store looking out the window at them. (Doc. 26-8 at 1). As Officer King was parking, Wright stood up and began walking away from the front of the store and toward the restroom. *Id.* Once the officers entered the store, Officer King observed Wright's hands in his pockets. *Id.* at 2. In Officer King's opinion, "[at] that point, Mr. Wright posed a safety risk because we did not know if he put anything illegal or harmful in his pockets, and it ha[d] been well over an hour since we last had contact with Mr. Wright." *Id.* Officer King found it suspicious that Wright began walking toward the restroom as soon as he saw the officers parking their vehicles. *Id.* Once Wright was detained and frisked, he was allowed to use the restroom. *Id.* Officer King remained standing in the open doorway to the restroom while Wright and Officer Morris went inside. *Id.*

Wright's version of these same events is as follows. Wright testified at his deposition that if viewed from the outside looking into Casey's, he and McNeil were sitting

---

[2] Wright disputes that he was transported to the Pleasant Grove Walmart and was released into the custody of the Springdale Police Department. (Doc. 47, p. 2). This dispute of fact is not material to the issues before the Court on summary judgment.

5

at a table to the left of the door. (Doc. 26-6 at 3). The restroom was located to the right of the door. *Id.* They both looked up when police cars came "barreling in on both sides." *Id.* at 4. Wright testified that he was getting up to go to the restroom. and as he passed the front door, the officers came in. *Id.* The officers told him to stop, and Wright admits that he kept walking for five or six feet until Officer Morris grabbed his arm and stopped him. *Id.* Wright told the officer that he needed "to go to the bathroom now." *Id.* According to Wright, he "went to the bathroom standing up while they were holding me." *Id.* at 11. Wright testified that Officer Morris knew it and smelled it. *Id.* Wright indicated that this was when the officers finally let him go to the restroom. *Id.*

Wright testified that Officer King stood in the doorway to the restroom holding the door open, while Officer Morris went into the restroom with Wright and kept the stall door all the way open. *Id.* at 5-6. Although Wright did not see anyone walking by, he claims there was a "direct path" allowing anyone to "see into the bathroom." *Id.* at 5. According to Wright, the officers kept telling him to hurry up; and for this reason, Wright showed Officer Morris paper with feces and blood on it. *Id.* at 7. Wright testified that Officer Morris looked away and said to hurry up. *Id.* Wright indicated that he then had to clean out his underwear and pants. *Id.* at 8-9. He testified that when he was rubbing his pants leg, he did not have leg cramps but was simply cleaning his pants. *Id.* In Wright's estimation, he was only in the stall for about two minutes. *Id.* at 6. However, the dashcam video indicates that Wright and the officers were in the restroom for approximately seven minutes. (Doc. 26-3).

Wright believes that the "police department is responsible for its officers." (Doc.

26-6 at 10). When he was asked if there was a City of Bella Vista policy or custom that he contended was unconstitutional, Wright replied not that he was aware of one. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1982), or "when a reasonable jury could return a verdict for the nonmoving party on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (citation and internal quotation marks omitted).

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l. Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l. Bank*, 165 F.3d at 607 (citing *Anderson*, 477 U.S. at 249). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621,

7

625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Defendants maintain that they are entitled to summary judgment for the following reasons: (1) Wright was lawfully detained while the officers waited for confirmation of the warrant; (2) the Eighth Amendment claim should be dismissed because Wright was not a prisoner; (3) the officers' relatively non-intrusive invasion of Wright's privacy was objectively reasonable in light of the circumstances; (4) there is no legal basis for holding the City of Bella Vista liable; and (5) if Wright's constitutional rights were violated, Defendants are entitled to qualified immunity.

#### A. Unlawful Detention Claim

The facts surrounding Wright's detention at Casey's are for the most part undisputed. For summary judgment purposes, where a dispute exists, the Court has assumed that the facts provided by Wright are true. The first legal question for the Court is whether Wright's detention was unlawful.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. "[T]he Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" *Davis v. Mississippi*, 394 U.S. 721, 726 (1968). "[W]henever a police officer accosts an individual and restrains his freedom

to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). The "ultimate touchstone . . . is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014).

Here, Wright was clearly detained. He was placed in handcuffs and at least initially told he could not go to the restroom. The Supreme Court has held that "the police could stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30). "The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 201, 217 (1984). It demands "specific and articulable facts which, taken together with rational inferences from those facts," *Terry*, 392 U.S. at 21, provide the detaining officers with a "particularized and objective basis for suspecting legal wrongdoing," *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Officers Morris and King had received information from the Arkansas Crime Information Center that there was a possible outstanding warrant issued for Wright. The Supreme Court has recognized that "[e]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *United States v. Hensley*, 469 U.S. 221, 231 (1985). In this case, the information came from a criminal database provided by various law enforcement agencies. *Cf. Whiteley v. Warden*, 401 U.S. 560, 568 (1971) (finding that arresting officers were entitled to rely on a radio broadcast even though the bulletin ended up not

being supported by probable cause). An officer's objectively reasonable belief in the existence of an outstanding warrant provides the reasonable suspicion necessary to detain. *See, e.g., Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010) ("An officer's reasonable belief in the existence of an outstanding warrant justifies an investigatory stop of a person while the warrant's existence is confirmed."); *United States v. Daniels*, 2014 WL 7781016, at *5 (N.D. Ga. Oct. 24, 2014) (holding that an officer advised of a possible probation warrant had reasonable suspicion to detain an individual).

In this case, the investigative detention was brief. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). Less than three minutes elapsed between the time Officer Morris entered Casey's and told Wright he was being detained and the time when all three men entered the restroom. (Doc. 26-3). During this time, Wright was handcuffed and his pockets were searched. While Wright was in the restroom, his warrant was confirmed, and he was advised that he was under arrest. Approximately eleven minutes elapsed between the officers entering Casey's and exiting the store with Wright in custody. *See* Doc. 26-3.

In *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006), the Eighth Circuit discussed the use of handcuffs during an investigative detention. The Court explained:

> During an investigative stop, officers should use the least intrusive means of detention and investigation reasonably necessary to achieve the purpose of the detention. During a *Terry* stop, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the stop. This court has previously held that the use of handcuffs can be a reasonable precaution during a *Terry* stop to

protect their safety and maintain the status quo.

*Id.*

Here, when the officers first encountered Wright at Casey's, Wright had been outside the presence of law enforcement for more than an hour. He was wearing a coat that officers believed he was not wearing an hour before, and he put his hands in his pockets and began walking toward the restroom at around the time he observed the patrol cars nearing the store. In addition, when Wright was initially asked to stop, he admits he kept walking and did not halt until Officer Morris grabbed his arm. Finally, Casey's was open to the public and had members of the public inside at the same time that Wright's detention and arrest were taking place. Taking all of these facts together, the Court concludes that the officers' decision to place Wright in handcuffs "was a reasonable response to the situation in order to protect the officers' personal safety," to protect the public, and to "maintain the status quo." *Martinez*, 462 F.3d at 907.

There are no genuine issues of material fact as to whether the Fourth Amendment was violated by the brief investigative detention here. Defendants are entitled to summary judgment on this claim.

## B. Eighth Amendment Claim

Wright maintains that the Defendants subjected him to cruel and unusual punishment under the Eighth Amendment when they detained him on his way to the restroom. The Eighth Amendment's prohibition on cruel and unusual punishment by state actors only applies "*after* the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651,

671, n.40 (1977) (emphasis added). In other words, "the treatment a prisoner receives *in prison* and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993) (emphasis added). Wright's complaints about his detention and arrest do not implicate the Eighth Amendment and are instead properly analyzed under the Fourth and Fourteenth Amendments.

### C. Invasion of Privacy Claim

Wright contends that his privacy was invaded, not by the pat-down search of his person, but by the officers observing him while he was using the restroom. Wright argues that he should have been allowed to use the restroom alone and believes his Fourth and Fourteenth Amendment rights were violated.

### 1. Fourth Amendment Claim

The Fourth Amendment protects against unreasonable searches and seizures by government officials. Const. amend. IV. "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady v. North Carolina*, 575 U.S. 306, 310 (2015). As Defendants aptly note, the "broad search condition—imposed for [Wright's] prior criminal activity—'significantly diminished [Wright's] reasonable expectation of privacy' . . . and duly served the state's legitimate interests in preventing, detecting, and punishing additional criminal activity." *United States v. Rodriquez*, 829 F.3d 960, 962 (8th Cir. 2016) (quoting *United States v. Knights*, 534 U.S. 112, 120-21 (2001)).

"To invoke the protection of the Fourth Amendment, one must establish a legitimate expectation of privacy in the invaded place." *United States v. Hill*, 393 F.3d 839, 841 (8th Cir. 2005) (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). Therefore, one issue to consider is whether Wright had a legitimate expectation of privacy in the public restroom. In *United States v. Hill*, the Eighth Circuit considered an individual's expectation of privacy in a convenience store restroom and found that

> an expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home. These cases recognize that regardless of one's subjective expectation of privacy in a public restroom, society's recognition of that expectation of privacy is limited by the physical design of the restroom, the location of the restroom, and the probability that one will be asked to surrender use of the restroom to others.

393 F.3d at 841.

Even when an individual has entered a stall, there is no legitimate expectation of privacy to the extent he may be seen by someone in the common area of the restroom. *See, e.g., United States v. White*, 890 F.2d 1012 (8th Cir. 1989) (finding that an officer's observations made through gaps in stall did not violate the Fourth Amendment).

Next, the Court finds that Wright's expectation of privacy in using the public restroom was further diminished by the fact that he was being searched and handcuffed at the time he told officers he needed to use the restroom. Officers Morris and King allowed him to use the restroom, but they decided to accompany him there, since he was in their custody. Moreover, this particular restroom was open to the public, contained multiple stalls and urinals, and had no lock on the outside door. According to Wright, he entered a stall and Officer Morris held the stall door open, but Officer Morris did not enter

13

the stall with Wright. Finally, Wright does not contend that any member of the public actually observed him while he was in the restroom, since Officer King stood at the restroom door and Officer Morris stood in front of the stall. Because the Court concludes that police surveillance in this public restroom did not violate a recognized privacy interest, Defendants are entitled to summary judgment on Wright's Fourth Amendment claim for invasion of privacy. In light of Wright's lawful detention by police as they verified the existence of an outstanding warrant, Wright did not have a legitimate expectation that he would be permitted to use the public restroom in private, unaccompanied by the officers.

## 2. Fourteenth Amendment Claim

The Supreme Court has recognized that "notions of substantive due process contained within the Fourteenth Amendment safeguard individuals from unwarranted governmental intrusions into their personal lives." *Whalen v. Roe*, 429 U.S. 589, 598 n. 23 (1977). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (citing *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847-849 (1992)).

The Supreme Court has also held that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process" must be the guide for analyzing these claims.'" *Albright*, 510 U.S. at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In *Albright*, the Supreme Court held that pretrial deprivations of liberty were covered by the Fourth Amendment and not

the Fourteenth, "with its 'scarce and open-ended guideposts.'" *Id.* at 275 (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125 (1992)).

The reasoning of *Albright* applies to this case, as Wright was a detainee/arrestee at all times relevant to his Complaint. As such, his claims are appropriately analyzed under the Fourth Amendment rather than the substantive due process clause of the Fourteenth Amendment. But even assuming the protections of substantive due process extended to this situation, the claim would fail. To establish a substantive due process violation, Wright must demonstrate not only that a fundamental right was involved but also that that the police officers' conduct shocks the conscience. *Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 980 (8th Cir. 2013) (citing *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009)); *see also Terrell v. Larson*, 396 F.3d 975, 980-81 (8th Cir. 2005). "Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury." *Terrell*, 396 F.3d at 981.

In *Terrell v. Larson*, the Eighth Circuit discussed the "level of culpability the § 1983 plaintiff must provide to establish that the defendant's conduct may be conscience shocking." 396 F.3d at 978. The Court reasoned:

> Mere negligence is never sufficient. Proof of intent to harm is usually required, but in some cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold. The deliberate indifference standard is sensibly employed only when actual deliberation is practical. By contrast, the intent-to-harm standard most clearly applies in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation.

15

*Id.* (citations and internal quotation marks omitted).[3]

The circumstances at issue in the case at bar do not demonstrate that Officers Morris and King were deliberately indifferent to Wright's constitutional rights. As discussed previously, the restroom at issue was public, the officers were detaining Wright on a suspected warrant and were concerned that he was hiding contraband, and there was a legitimate need to protect the public during Wright's detention and arrest. Further, the Court does not find that the officers' conduct shocks the conscience. For all these reasons, Defendants are entitled to summary judgment on the Fourteenth Amendment invasion of privacy claim.[4]

### 3. State Law Invasion of Privacy Claim

Defendants read Wright's Complaint as also asserting an invasion of privacy claim under Arkansas law. To the extent Wright asserts such a claim, the Court declines to retain supplemental jurisdiction over it. All claims within the original jurisdiction of the court are being dismissed. *See* 28 U.S.C. § 1367(c)(3) (c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

---

[3] For purposes of the discussion here, "deliberate indifference" requires a showing of conduct that is "more than mere unreasonableness, namely conduct that is so knowingly hostile or indifferent to a clearly establish constitutional right that it evidences a level of 'criminal recklessness.'" *Lund v. Hennepin Cnty.*, 427 F.3d 1123, 1127 (8th Cir. 2005) (citation omitted).

[4] There is no need for the Court to consider whether Defendants are entitled to qualified immunity at this point because the Court has already held that no constitutional violation occurred during Wright's detention and arrest. *See Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014).

### D. Official Capacity Claim

An official capacity claim against a defendant is "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). Wright's official capacity claims, were they cognizable, would have been treated as claims against the City of Bella Vista. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010). However, the Court has already determined that Wright's constitutional rights were not violated by the Bella Vista officers. The official capacity claims are dismissed.

### IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Defendants' Summary Judgment Motion (Doc. 26) is **GRANTED**, and all federal claims are **DISMISSED WITH PREJUDICE**. The Bella Vista Police Department is **TERMINATED** as a Defendant, as it is not subject to suit under § 1983. Finally, the Court declines to retain jurisdiction over any state-law invasion of privacy claim that might be construed from the Complaint, and the state-law claim is **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3). Judgment will enter accordingly.

**IT IS SO ORDERED** on this 3rd day of April, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE